**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER CLEMENS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 2:20-cv-03383 |
| EXECUPHARM, INC., | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT PURSUANT TO RULE 23(e)

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

SUMMARY OF THE LITIGATION ............................................................................... 2

I.    FACTUAL BACKGROUND ................................................................................... 2

II.   Procedural history .................................................................................................. 3

      A.  Litigation History.......................................................................................... 3

      B.  Settlement Negotiations ................................................................................ 5

SUMMARY OF PROPOSED SETTLEMENT AGREEMENT ..................................... 5

I.    The Settlement Class............................................................................................... 5

II.   The Settlement Benefits ......................................................................................... 6

      A.  Uncapped Cash Benefits ............................................................................... 6

          1. Reimbursement of Out-of-Pocket Losses .............................................. 6

2.    Reimbursement for Lost Time ............................................................................... 7

3.    Three-Bureau Credit Monitoring Services............................................................. 8

      B.  Attorneys' Fees and Expenses and Service Awards ...................................... 9

      C.  Expenses for Settlement Administration ..................................................... 10

      D.  Proposed Notice and Claims process.......................................................... 10

      E.  Proposed Releases....................................................................................... 11

III. Issuing Notice of the Proposed Settlement to the Class is Justified. ...................... 11

      A.  Standard for Issuance of Notice.................................................................. 11

      B.  The Proposed Settlement Is Fair, Reasonable, and Adequate Pursuant to the
          Rule 23(e) and Third Circuit Factors. ........................................................ 12

          1. The Class Representative and Class Counsel Have Provided Excellent
             Representation to the Class......................................................................... 13

2. The Settlement was Negotiated at Arm's Length. ........................................ 14

3. The Relief Provided for the Class is Adequate. .......................................... 15

4. The Settlement Treats Class Members Equitably Relative to Each Other. ................. 19

IV. THE PROPOSED SETTLEMENT CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION ............................................................................ 20

A.  The Rule 23(a) Requirements Are Satisfied. ................................................ 21

B.  The Rule 23(b)(3) Requirements Are Satisfied. ........................................... 23

V.  THE COURT SHOULD DESIGNATE INTERIM CLASS COUNSEL. ............................ 25

CONCLUSION ............................................................................................... 25

CERTIFICATE OF SERVICE .............................................................................. 26

APPENDIX A – TIMELINE OF SETTLEMENT EVENTS ....................................... 27

# TABLE OF AUTHORITIES

## Cases

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................ 13, 20, 22, 23

*Baby Neal for & by Kanter v. Casey*,
43 F.3d 48 (3d Cir. 1994) ................................................................. 22

*Balestra v. Cloud With Me Ltd.,*
2020 WL 4370392 (W.D. Pa. 2020) ................................................. 14

*Clemens v. ExecuPharm Inc*.,
48 F.4th 146 (3d Cir. 2022) .............................................................. 4, 15

*Corra v. ACTS Ret. Servs., Inc*.,
2024 WL 22075 (E.D. Pa. Jan. 2, 2024) ........................................... 20, 21, 23, 24

*Fulton-Green v. Accolade, Inc*.,
2019 WL 4677954 (E.D. Pa. Sept. 24, 2019) ................................... passim

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975) .............................................................. 13

*Huffman v. Prudential Ins. Co. of Am.,*
2018 WL 583046 (E.D. Pa. Jan. 29, 2018) ....................................... 21, 22

*In re Anthem, Inc. Data Breach Litig*.,
327 F.R.D. 299 (N.D. Cal. 2018) ...................................................... 16, 23, 24

*In re Baby Products Antitrust Litig*.,
708 F.3d 163 (3d Cir. 2013) .............................................................. 12

*In re Dvi, Inc. Sec. Litig*.,
No. CV 03-5336, 2016 WL 1182062 (E.D. Pa. Mar. 28, 2016) ........ 18

*In re Equifax Inc. Customer Data Sec. Litig.,*
999 F.3d 1247 (11th Cir. 2021) ........................................................ 23

*In re Equifax Inc. Customer Data Security Breach Litig.,*
2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ..................................... 16, 22, 24

*In re Gen. Motors Pick-Up Truck Fuel Tank Products Liab. Litig*.,
55 F.3d 768 (3d Cir. 1995) ................................................................ 12

*In re Initial Public Offering Sec. Litig.,*
260 F.R.D. 81 (S.D.N.Y. 2009) ......................................................... 23

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) ............................................................. 20

*In re Nat'l Football League Players' Concussion Injury Litig.*,
  961 F. Supp. 2d 708 (E.D. Pa. 2014) ................................................ 12

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ............................................................. 13

*In re Viropharma Inc. Sec. Litig.*,
  2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ........................................ 14

*Klingensmith v. Max & Erma's Restaurants, Inc.*, No. CIV.A.,
  07-0318, 2007 WL 3118505 (W.D. Pa. Oct. 23, 2007) ........................ 14

*McRobie v. Credit Prot. Ass'n*,
  2020 WL 6822970 (E.D. Pa. Nov. 20, 2020) ................................ 11, 12

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011) ................................................................. 3

*Rougvie v. Ascena Retail Grp., Inc.*,
  2016 WL 4111320, n.5 (E.D. Pa. July 29, 2016) ................................ 19

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001) ............................................................. 21

*Toretto v. Donnelley Fin. Sols., Inc.*,
  583 F. Supp. 3d 570 (S.D.N.Y. 2022) ................................................ 15

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ..................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................................... 21

**Statutes**

28 U.S.C. § 1715(b) ................................................................................ 27

Cal. Civ. Code § 1798.150(a)(1)(A) ........................................................ 19

**Rules**

Fed. R. Civ. P. 23(e) ....................................................................... passim

Fed. R. Civ. P. 23(e)(1) ................................................................... 12, 20

Fed. R. Civ. P. 23(e)(2)(A) .................................................................. 13

Fed. R. Civ. P. 23(e)(2)(B) ................................................................................. 14

Fed. R. Civ. P. 23(e)(2)(C) .................................................................. 15, 17, 18

Fed. R. Civ. P. 23(e)(2)(D) ................................................................................. 19

Fed. R. Civ. P. 23(e)(3) ....................................................................................... 19

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 3

Fed. R. Civ. P. 23(a) ........................................................................................... 21

Fed. R. Civ. P. 23(a)(3) ....................................................................................... 22

Fed. R. Civ. P. 23(b) ........................................................................................... 23

Fed. R. Civ. P. 23(b)(3) ................................................................................. 18, 23

Fed. R. Civ. P. 23(g)(3) ....................................................................................... 25

## **<u>Other Authorities</u>**

*Federal Practice and Procedure* § 1779 (3d ed. 2005) ........................................ 24

## **INTRODUCTION**

Plaintiff Jennifer Clemens ("Plaintiff"), individually and on behalf of all persons similarly situated, request that the Court preliminarily approve the proposed class settlement reached in this action arising from the March 2020 data breach of Defendant ExecuPharm, Inc. ("ExecuPharm"), and thus direct the issuance of notice to putative class members of the proposed settlement ("Settlement Agreement" or "Settlement"). Plaintiff alleges that the data breach at issue resulted in the exposure of the personal information of 3,728 individuals across the nation, including their Social Security Numbers, bank account information, driver's license numbers, passport numbers, and credit card information (the "Data Breach").

After nearly four years of litigation, including a successful appeal to the Third Circuit, the Settlement Agreement proposes to settle the claims of Plaintiff and those similarly situated brought in this Action. The proposed Settlement Class consists of "all residents of the United States whose Personal Information was accessed, impacted, compromised, exfiltrated, or stolen as a result of the Data Breach."

The Settlement Agreement is an excellent result for the Settlement Class Members, negotiated at arm's-length by counsel highly experienced in data breach litigation on both sides. It provides for: (1) cash payments to reimburse Settlement Class Members' documented out-of-pocket losses incurred as a result of the Data Breach, up to $10,000 per individual ("Out-of-Pocket Losses"); (2) reimbursement of Settlement Class Members' time spent remedying issues related to the Data Breach, up to seven hours at $25 per hour ($175 maximum) ("Undocumented Lost Time"), along with reimbursement for an additional five hours at $25 per hour if such efforts are documented ($125 maximum) ("Documented Lost Time"); (3) in lieu of submitting a claim for Out-of-Pocket Losses, Undocumented Lost Time, and Documented Lost Time, California residents may recover a one-time payment of $100 without the need to provide any documentation

1

(to account for their statutory claim under the California Consumer Privacy Act); and (4) access to three years of three-bureau credit monitoring services.

The cash benefits being made available to Settlement Class Members are not subject to an aggregate cap, meaning that individual recoveries will not be reduced depending on the number of claimants. Finally, ExecuPharm has agreed to separately pay notice and administration costs, as well as attorneys' fees, expenses, and a service award approved by the Court, which will not reduce any of the relief being made available to the Class.

As the proposed Settlement Agreement is fair, reasonable and adequate and meets the requirements of Rule 23(e)(1)(B), Plaintiff respectfully requests that this Court determine that it is likely to approve the Settlement and certify the Settlement Class for purposes of entering judgment on the Settlement, and direct that notice of the Settlement be issued.

## SUMMARY OF THE LITIGATION

### I.     FACTUAL BACKGROUND

Plaintiff began working for ExecuPharm in February 2016 as a clinical technical editor. Dkt. 49 (First Amended Complaint) at ¶ 56. As a condition of employment, she was required to give the company substantial information about herself, her finances, and her family. *Id.* at ¶ 57. ExecuPharm promised that it would keep this information secure, stating in its employment contract that it "will take appropriate measures to protect the confidentiality and security of all personal data." *Id.* at ¶ 58. Plaintiff left the company later that year, but rather than delete her sensitive data, ExecuPharm continued to retain it even after she was no longer employed. *Id.* at ¶ 59.

More than three years later, a ransomware hacking group known as "CL0P" launched a successful attack on ExecuPharm's computer system. After exfiltrating the personal information of Plaintiff and other ExecuPharm employees, the hackers disseminated the information onto the

"dark web"—non-indexed websites that can only be accessed by use of an anonymizing browser, which can be used to sell stolen information to identity thieves and other criminals. *Id.* at ¶ 15. As a result of the breach of her personal information, Plaintiff was required to take numerous steps to protect herself from identity theft and other further harm, including purchasing a monthly credit monitoring service to mitigate the risk of criminal activity to her and her family at a cost of $39.99 per month. *Id.* at ¶ 71. Further, the stress and anxiety induced by the incident required her to seek counseling services. *Id.* at ¶ 72.

## II.    PROCEDURAL HISTORY

### A.    LITIGATION HISTORY

On July 10, 2020, Ms. Clemens filed suit against ExecuPharm and Parexel in the United States District Court for the Eastern District of Pennsylvania. Dkt. 1. She sought to represent a class of similarly situated victims of the data breach, and asserted seven counts against ExecuPharm for negligence, negligence *per se*, breach of implied contract, breach of express contract, breach of fiduciary duty, breach of confidence, and a request for declaratory judgment, and four counts against Parexel for negligence, negligence *per se*, breach of implied contract, and declaratory judgment. *Id.* at ¶¶ 116-161. Initially, ExecuPharm and Parexel sought dismissal under Federal Rule of Civil Procedure 12(b)(6), raising numerous claim-specific arguments. Dkt. 14. While the motion was pending, the Court ordered the Parties to file supplemental briefing addressing the question of Article III standing under the Third Circuit Court of Appeals' decision in *Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011).

The Parties briefed the standing issue, and shortly thereafter, the district court rendered its judgment, holding that the Plaintiff lacked standing to sue. Dkt. 27. It held that "the Third Circuit drew a bright line—allegations of an increased risk of identity theft resulting from a security breach are insufficient to secure standing." *Id.* at 9. Applying this bright line rule, it held that because Ms.

3

Clemens had not been a victim of identity theft or other fraud, she did not have standing to sue, regardless of the manifest risk she and other employees faced. *Id.* at 10-12.

Plaintiff appealed. Dkt. 29. After full briefing and argument, a unanimous Third Circuit panel vacated the district court's judgment, holding that "in the data breach context, where the asserted theory of injury is a substantial risk of identity theft or fraud", a plaintiff has standing "as long as he alleges that the exposure to that substantial risk caused additional, currently felt concrete harms", such as "emotional distress or spen[ding] money on mitigation measures like credit monitoring services." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155–56 (3d Cir. 2022). In assessing whether the risk is substantial, the Third Circuit set out a list of "non-exhaustive factors" meant to "serve as useful guideposts", including "whether the data breach was intentional", "whether the data was misused", and "whether the nature of the information accessed through the data breach could subject a plaintiff to a risk of identity theft." *Id.* at 153-54. Applying these factors to the facts in this case, the court held that "Clemens has standing to assert her contract, tort, and secondary contract claims" because "she has alleged a future injury—the risk of identity theft or fraud—that is sufficiently imminent." *Id.* at 159.

Following remand to this Court, Defendants again pressed the arguments raised in their original motion to dismiss. Dkt. 33. Plaintiff opposed these arguments, *see* Dkt. 34, and the Court largely sustained her claims. Dkt. 41. It found that she had stated a claim under Pennsylvania law against ExecuPharm for negligence, breach of express and implied contract, and for declaratory judgment. *Id.* at 7-14. It did, however, dismiss Plaintiff's claims against Parexel, as well as her claims for negligence *per se*, breach of fiduciary duty, and breach of confidence asserted against ExecuPharm, though it granted her leave to amend as to the latter two. *Id.* at 7; 11-13. Plaintiff did so amend, filing her First Amended Complaint, which omitted Parexel as a defendant and included

4

additional allegations bearing on her claims for breach of confidence and fiduciary duty. Dkt. 49. The Court thereafter dismissed those two claims. Dkt. 55.

ExecuPharm answered, *see* Dkt. 57, and the Court subsequently set the case for a status conference. Dkt. 58. Before that conference occurred, though, the Parties agreed to terms for a settlement of the case and filed a notice regarding the same. Dkt. 59.

### B. SETTLEMENT NEGOTIATIONS

On January 23, 2023, counsel for the Parties participated in a full-day mediation with mediator Robert A. Meyer of JAMS. *See* Declaration of J. Austin Moore ("Moore Decl."), ¶ 18. Though that mediation did not result in settlement, the Parties continued negotiations through Mr. Meyer and directly through counsel but were initially unsuccessful at reaching resolution. *Id*. The Parties thereafter returned to litigation in this Court. *Id*. ¶ 19. As motion practice was progressing in litigation, the Parties maintained an ongoing dialogue concerning possible settlement of the case. After the scope of the case was set by the Court's orders, *see* Dkt. 41; 55, the parties agreed to the material terms of a settlement on February 12, 2024. Moore Decl. ¶ 19. After reaching this agreement in principle, the Parties finalized the terms of this Settlement Agreement and the exhibits attached hereto. *Id*. The Settlement Agreement is attached as Exhibit 1 to Plaintiff's Motion and referred to herein as "Ex. 1" or "Agreement."

### SUMMARY OF PROPOSED SETTLEMENT AGREEMENT

The terms of the Parties' proposed Settlement Agreement are as follows:

## I. THE SETTLEMENT CLASS

The Settlement will provide benefits to 3,728 members of the Settlement Class defined as follows: "all residents of the United States whose Personal Information was accessed, impacted, compromised, exfiltrated, or stolen as a result of the Data Breach.  Excluded from the Settlement Class are (i) ExecuPharm, and ExecuPharm's board of directors, legal representatives, successors,

subsidiaries, and assigns; (ii) any judge, justice, or judicial officer presiding over the Action and the members of their immediate families and judicial staff; and (iii) any individual who timely and validly opts out of the Settlement" *See* Ex. 1, ¶ 2.38.

## II.  THE SETTLEMENT BENEFITS

### A.  UNCAPPED CASH BENEFITS

Following mailing of the notices, Settlement Class Members[1] will have 90 days to file claims for three years of 3-bureau credit monitoring services and two types of losses arising from the Data Breach: Out-of-Pocket Expenses and Lost Time. *Id.* ¶¶ 5.1-5.1.4; Moore Decl., ¶¶ 21, 22. The cash funds available to settle these claims is uncapped, meaning that Settlement Class Members will be paid 100% of their losses subject to the individual caps set forth in the Settlement Agreement, without any risk of a reduction based on the number of claimants. This is a material benefit as Settlement Class Members will know exactly what they are eligible to receive at the time they submit a claim. Moore Decl., ¶ 23.

#### 1.  Reimbursement of Out-of-Pocket Losses

The first component of the Settlement is reimbursement of Out-of-Pocket Losses resulting from the Data Breach, up to $10,000 per individual. Moore Decl., ¶ 24. The Settlement reimburses Settlement Class Members for the following broad range of harms that are likely to flow from the Data Breach, including, but not limited to, the following:

- costs, expenses, losses, or other charges incurred as a result of identity theft or identity fraud, falsified tax returns, or other possible misuse of a Settlement Class Member's Personal Information;

- costs incurred after the Data Breach was disclosed associated with changing accounts or engaging in other mitigative conduct, such costs may include notary, fax, postage, copying, mileage, and long-distance telephone charges;

---

[1] A "Settlement Class Member" is defined at paragraph 2.39 of the Agreement to include any person within the definition of Settlement Class.

- professional fees incurred to address the Data Breach; and

- purchasing credit monitoring or other mitigative services after the Data Breach was disclosed, through the date of the Settlement Class Member's Claim submission.

Proposed Class Counsel ("Class Counsel")[2] believe that the $10,000 individual cap will be sufficient to cover all potential losses suffered as a result of the Data Breach. When a victim incurs out-of-pocket expenses relating to a data breach, the expenses are typically associated with seeking advice about how to address the incident (*e.g.*, paying for professional services), paying incidental costs associated with identity theft or fraud (*e.g.*, overdraft fees or costs for sending documents by certified mail), or taking mitigative measures like paying for credit monitoring or credit freezes. Moore Decl., ¶ 25. As such, the out-of-pocket expenses associated with a data breach are generally relatively modest, and rarely exceed several hundred dollars. *Id.* When victims spend more than this amount, it is typically due to professional services such as those provided by an accountant, attorney, or credit repair specialist. *Id.* ¶¶ 25, 26. Thus, the high individual cap will ensure that even individuals who suffered outlier losses will be eligible to participate in the Settlement.

### 2.    Reimbursement for Lost Time

The second component of the Settlement is reimbursement for time spent remedying issues related to the Data Breach. *See* Ex. 1, ¶¶ 5.1.1-5.1.2. Settlement Class Members can make a claim for reimbursement for up to seven (7) hours of time spent at $25 per hour ($175) without any documentation, and an additional five (5) hours at $25 per hour ($125) with reasonable documentation of how the time was spent. *Id.* This is an important benefit as it permits Settlement Class Members to receive compensation for their valuable time and effort spent dealing with the Data Breach.

---

[2] In conjunction with Settlement, Plaintiff seeks the appointment of Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP and Mark S. Goldman of Goldman Scarlato & Penny, P.C., as Interim Class Counsel pursuant to Rule 23(g).

### 3. Three-Bureau Credit Monitoring Services

The Settlement also provides concrete benefits to Settlement Class Members concerned about future misuse of their compromised information. It makes available to all Settlement Class Members three years of free three-bureau credit monitoring services. *Id*. ¶ 5.1.4.[3] Credit monitoring is a service that monitors an individual's credit reports and alerts the individual when any change is made that could signal fraudulent activity, such as new credit card or loan applications, new credit inquiries, existing account changes, and new public records or address changes, among others. *See* Moore Decl. ¶ 30. Credit monitoring gives the individual the opportunity to confirm the accuracy of a credit change in real time and, if necessary, address the issue before fraud occurs or expands. *Id.* Accordingly, the Parties have made available to all Settlement Class Members who submit a claim a robust monitoring service through CyEx called Identity Defense Total, which includes the following features:

- ***3 Bureau Credit Monitoring*** - Monitors credit files at Experian, Equifax, and TransUnion and sends alert when potential fraudulent activity occurs

- ***Monthly Credit Score*** - Tracks credit status with a monthly VantageScore 3.0

- ***Change of Address Monitoring*** – Sends alert when mail is rerouted to new address

- ***Real-Time Inquiry Alerts*** - Notifies in real time when a credit inquiry within a credit file is detected

- ***Real-Time Authentication Alerts*** - Provides notification when a creditor receives a request for certain types of account transaction using individual's Social Security Number

---

[3] There are three major credit reporting agencies in the United States: Experian, Equifax and TransUnion. While many credit monitoring services only monitor an individual's credit activity with one agency, the more robust services such as the one offered to Settlement Class Members in the proposed Settlement monitor activity from all three major credit reporting agencies. Moore Decl., ¶¶ 30-31. This is important because each agency operates independently from one another, and the information they receive from creditors can be different. As such, utilizing a credit monitoring services that monitors an individual's reports with all three agencies ensures that there are no gaps in coverage. *Id.*

- ***Dark Web Monitoring*** - Tracks and alerts when personal information is found on dark web

- ***$1,000,000 Identity Theft Insurance*** – No deductible to file a claim

- ***Real-Time Customer Support*** - Agents trained in fraud resolution assistance

*Id.* ¶ 31. The Credit Monitoring Services provide significant value to the Settlement Class. While the Parties were able to secure discounted pricing based on the size of the Settlement Class, the retail value of this product is $19.99 per month, equating to a benefit of nearly $720 per class member and $2.7 million for the class as a whole. Moore Decl., ¶ 32.

**B.    ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS**

After the substantive terms of the Settlement were agreed upon, the Parties then turned to the payment of attorneys' fees, expenses, and service awards to Plaintiff.[4] Ex. 1, ¶¶ 16.1-16.2; *see also* Moore Decl. ¶ 33. Prior to that point, the Parties had only discussed that ExecuPharm would separately pay for reasonable attorneys' fees and expenses, as approved by the Court. Ex. 1, ¶ 16.1; *see also* Moore Decl. ¶ 33.

Pursuant to the Settlement, ExecuPharm will not object to a request by Class Counsel for combined attorneys' fees and expenses in an amount not to exceed $675,000. Moore Decl. ¶ 34. ExecuPharm has also agreed not to object to a request for a service award for Plaintiff as Class Representative in the amount of $5,000, in recognition of the time, effort, and expense she incurred in pursing claims that ultimately benefited the entire Settlement Class. *Id.* ¶ 35.

ExecuPharm will pay for these attorneys' fees, expenses, and service awards, as approved by the Court, separate and apart from all other relief made available under the Settlement. *Id.* ¶ 36. As a result, the payment of attorneys' fees and service awards will not reduce any of the relief

---

[4] Plaintiff is referred to in the Settlement Agreement as the "Class Representative." Ex. 1, ¶ 2.40.

made available to Settlement Class Members, and they are intended to be considered separately from the fairness, reasonableness, and adequacy of the Settlement. *Id*.

### C.    EXPENSES FOR SETTLEMENT ADMINISTRATION

ExecuPharm will also pay all costs of notice and administration of the Settlement, including the fees and expenses of the Settlement Administrator. Ex. 1, ¶ 6.2.

### D.    PROPOSED NOTICE AND CLAIMS PROCESS

Within twenty (20) days after the Court enters a preliminary approval order ("Preliminary Approval"), ExecuPharm will provide the Settlement Administrator with the names and last known mailing address of Class Members that are currently in its possession. *Id*.  ¶ 7.1.1. Then, starting within forty-five (45) days after Preliminary Approval, the Settlement Administrator will mail notice of the Settlement ("Notice") to all Class Members via U.S. mail (the "Notice Date"). Ex. 1, ¶ 2.24. Prior to dissemination of Notice, the Settlement Administrator will have set up both a website ("Settlement Website") where the Settlement Class may access information about the Settlement and submit Claims, and a toll-free number ("Settlement Toll-Free Number") where they may seek information relevant to the Settlement. Moore Decl., ¶ 39; Ex. 1, ¶¶ 6.1.4; 6.1.6.

Class Members will receive notice by direct U.S. Mail *and* e-mail where such information is known, with an additional e-mail reminder to be sent to those Class Members who do not initially submit claims. The mailed notice will include the entire Long Form Notice and the e-mailed notice will include the Short Notice, each of which will inform Settlement Class Members of the Settlement, summarize the benefits available, and refer them to the Settlement Website for more information regarding the Settlement, including instructions on filing a Claim. Moore Decl., ¶ 40.

The Settlement Website will include the Long Notice and provide more details regarding the underlying Action and Settlement, including how to opt out of or object to the Settlement; how to submit a Claim (including an option for doing so electronically); the deadline to submit a Claim,

opt out, or object; and information regarding the date, time, and location of the Final Fairness Hearing. Ex. 1, Exhibit C (Long Notice); Exhibit D (Short Notice).

Settlement Class Members have 90 days after the Notice Date to make a Claim for benefits, or 40 days to opt out of the Settlement. Ex. 1, ¶¶ 2.8, 2.26. The Settlement Administrator will mail checks (or other electronic means of payment such as PayPal and Venmo) for approved claims within thirty (30) days of final approval of the Settlement (the "Effective Date"), or after the date the Claim is approved, whichever is latest. *Id.* ¶ 19.2.

The Parties believe that this notice plan is the best available under the circumstances as it involves direct mail and email notice to all Settlement Class Members. Moore Decl., ¶¶ 43, 48. After engaging in a competitive bidding process, the Parties selected Simpluris, Inc. ("Simpluris") to serve as the Settlement Administrator. *Id.* ¶ 38.

### E.    PROPOSED RELEASES

In exchange for the benefits provided under the Settlement, Settlement Class Members will release "on behalf of themselves, their heirs, assigns, beneficiaries, executors, administrators, predecessors, and successors, and any other person purporting to claim on their behalf, hereby expressly, generally, absolutely, unconditionally, and forever release and discharge any and all Released Claims against the Released Parties, except for claims relating to the enforcement of the Settlement or this Agreement." Ex. 1, ¶ 11.1.

## III.    ISSUING NOTICE OF THE PROPOSED SETTLEMENT TO THE CLASS IS JUSTIFIED.

### A.    STANDARD FOR ISSUANCE OF NOTICE

"Review of a proposed class action settlement typically proceeds in two stages. At the first stage, the parties submit the proposed settlement to the court, which must make a preliminary fairness evaluation." *McRobie v. Credit Prot. Ass'n*, 2020 WL 6822970, at *2 (E.D. Pa. Nov. 20,

2020) (quoting *In re Nat'l Football League Players' Concussion Injury Litig*., 961 F. Supp. 2d 708, 713-14 (E.D. Pa. 2014)). "Only if the proposed settlement is found to be preliminarily acceptable does a court direct notice to all class members who would be bound by the settlement, so that they may have an opportunity to be heard, object to, and potentially opt out of the settlement." *Id*.

Under Rule 23(e)(1), the Court must direct notice to the class of a settlement upon determining that notice is justified because the Court concludes it is more likely than not to finally approve the settlement and certify a settlement class. *See* Fed. R. Civ. P. 23(e)(1)(B). The amendments specify that before finally approving a settlement, a court should consider whether (1) the class was adequately represented; (2) the settlement was negotiated at arm's length; (3) the relief is adequate, taking into account the costs, risks, and delay of trial and appeal; how the relief will be distributed; the terms governing attorneys' fees; and any side agreements; and (4) whether class members are treated equitably relative to each other. *Id*.

The goal of the Court's inquiry at the preliminary approval stage is determine whether a proposed settlement is fair and likely to be approved. *See In re Baby Products Antitrust Litig*., 708 F.3d 163, 173-74 (3d Cir. 2013) ("The role of a district court is not to determine whether the settlement is the fairest possible resolution... The Court must determine whether the compromises reflected in the settlement… are fair, reasonable, and adequate when considered from the perspective of the class as a whole.). And, where the negotiated resolution is fair, reasonable, and adequate, the Third Circuit favors settlement over protracted litigation. *In re Gen. Motors Pick-Up Truck Fuel Tank Products Liab. Litig*., 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

**B.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE PURSUANT TO THE RULE 23(E) AND THIRD CIRCUIT FACTORS.**

An evaluation of the relevant factors confirms that the proposed Settlement is fair, adequate, and reasonable under Rule 23(e) and the additional factors deemed relevant by the Third Circuit, which include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

### 1.    The Class Representative and Class Counsel Have Provided Excellent Representation to the Class.

To preliminarily approve a settlement, Rule 23(e)(2)(A) requires a court to find that "the class representatives and class counsel have adequately represented the class." This factor focuses "on the actual performance of counsel acting on behalf of the class."  Fed. R. Civ. P. 23, Advisory Committee Notes (Dec. 1, 2018) (hereafter "Advisory Committee Notes"); *see also In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016) (class counsel should "develop[] enough information about the case to appreciate sufficiently the value of the claims").

First, the interests of the Class Representative is aligned with those of other Settlement Class Members, as she alleges that they all suffered and seek to redress the same injury: the potential theft of their personal information in the Data Breach. *See Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625–26 (1997) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (cleaned up).

Next, Class Counsel are highly experienced in complex class actions and data breach litigation in particular, having been appointed as lead or co-lead counsel in many of the largest

13

data breach cases in history. *See* Moore Decl., ¶¶ 2-3. This knowledge and experience enabled Class Counsel to efficiently prosecute the case and negotiate a well-informed settlement. *See Balestra v. Cloud With Me Ltd.,* 2020 WL 4370392, *3 (W.D. Pa. 2020) (finding class counsel adequate because "the proposed firm has significant experience in litigating class action securities cases."). Further, prior to filing this case, Class Counsel conducted a thorough investigation of the potential claims, including researching ExecuPharm's business practices and relationship, consulting with experts regarding the nature and scope of the Data Breach, and interviewing potentially affected employees. *See* Moore Decl., ¶ 8.

Due to their experience in litigating data breach cases, investigation of this case, and this Court's decision defining the legal contours of their claims, Class Counsel gained insight into the facts and legal issues necessary to make an informed judgment concerning settlement. And while formal discovery in this action was stayed pending the motions to dismiss, the Parties engaged in settlement-related discovery that provided Class Counsel with adequate and sufficient information to engage in informed negotiations on behalf of the Settlement Class. Moore Decl. ¶ 19. *See Klingensmith v. Max & Erma's Restaurants, Inc.*, No. CIV.A. 07-0318, 2007 WL 3118505, at *4 (W.D. Pa. Oct. 23, 2007) ("formal discovery is not necessary to settlement where plaintiff has had access to information") (citations omitted). This factor therefore weighs in favor of approval.

## 2.    The Settlement was Negotiated at Arm's Length.

Another element of procedural fairness, as required by Rule 23(e)(2)(B), is that "the proposal was negotiated at arm's length." The "participation of an independent mediator … virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties." *In re Viropharma Inc. Sec. Litig.*, 2016 WL 312108, at *8 (E.D. Pa. Jan. 25, 2016) As Class Counsel has attested, the negotiations leading to the present Settlement were hard

fought over a number of years, arms-length, and involved the assistance of a mediator. *See* Moore

Decl. ¶¶ 18-20; 45. Further, these negotiations were pursued by experienced counsel, *see id.* ¶¶ 2-

3, and only after vigorous adversarial litigation that spanned nearly four years. Therefore, the

nature of the Parties' negotiations leading to the proposed Settlement weighs in favor of approval.

### 3.    The Relief Provided for the Class is Adequate.

Taking into account the relevant factors, and as described below, the Settlement offers

adequate relief to the Class Members.

#### i.    the costs, risks, and delay of trial and appeal;

In assessing the substantive adequacy of a proposed class settlement, Rule 23(e) requires a

court to consider "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i);

*see also Fulton-Green v. Accolade, Inc*., 2019 WL 4677954, at *10 (E.D. Pa. Sept. 24, 2019)

("three *Girsh* factors [4-6] require the Court to 'survey the potential risks and rewards of

proceeding to litigation in order to weigh the likelihood of success against the benefits of an

immediate settlement.'") (citations omitted). Due to the contested nature of the litigation, it has

taken nearly four years of motion practice and an appeal to reach the present stage in the case. It

is evident that further disputes lay ahead in this inherently complex class action, with risks to all

parties. This is especially true given that ExecuPharm continues to deny liability. Ex. 1, ¶ 12.1-

12.2. And while Class Counsel is experienced in data breach cases and the legal and factual issues

that they present, it is still a relatively new and developing field of litigation, with particular

uncertainty as it relates to class certification and trial. As courts have recognized, "[d]ata breach

jurisprudence has developed significantly in [recent] years." *Toretto v. Donnelley Fin. Sols., Inc*.,

583 F. Supp. 3d 570, 594 (S.D.N.Y. 2022). This evolution is certain to continue, with the Third

Circuit having just recently provided guidance on the threshold Article III standing issues in the

data breach context in this very case. *See Clemens v. ExecuPharm Inc.,* 48 F.4th 146 (3d Cir.

2022); *see also In re Equifax Inc. Customer Data Security Breach Litig.*, 2020 WL 256132, at *32

(N.D. Ga. Mar. 17, 2020) (noting that data breach plaintiffs' "path forward remained difficult," as

"[t]he law in data breach litigation remains uncertain and the applicable legal principles have

continued to evolve"). Here too, liability is far from certain and "continued litigation would entail

a lengthy and expensive legal battle that may result in no relief or substantially delayed relief to

the Settlement Class." *Fulton-Green*, 2019 WL 4677954, at *10.

Further, the Settlement provides meaningful relief to Settlement Class Members. First, they

can recover all of their out-of-pocket losses up to $10,000, as well as up to $300 for time spent

addressing the Data Breach, which is relief that may not even be available at trial. Moreover, the

aggregate amounts paid to Settlement Class Members are uncapped, largely negating the element

of the Defendant's ability to withstand a greater judgment at trial. *See Fulton-Green v. Accolade,*

*Inc.*, 2019 WL 4677954, at *10 (E.D. Pa. Sept. 24, 2019).

Further, provisions of the Settlement aim to protect the Settlement Class Members from

the future risk of identity theft or fraud by providing access to robust Credit Monitoring Services

specifically designed to detect or limit potential misuse of their information. Ex. 1, ¶ 5.1.4. These

benefits are more valuable to Settlement Class Members if implemented now—rather than being

held up through the course of a protracted litigation among the Parties—and are not otherwise

available at trial. *See In re Equifax,* 2020 WL 256132, at *7 (benefits to class in data breach

settlement, "including credit monitoring and injunctive relief," have "added value by being

available now, rather than after years of continued litigation"); *In re Anthem, Inc. Data Breach*

*Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018) (noting that the "negative effects of delay are

especially acute" in the data breach context, where "credit monitoring is most important for the

five years following a data breach" and "it is imperative that [defendant] implement the security

measures sooner rather than later."). Given the nature of the benefits made available under the Settlement and relaxed proof requirements, it is doubtful Plaintiff could obtain a better result even if she prevailed at trial. Further, if Plaintiff lost any issue at any stage, the class would recover *nothing*. This factor weighs in favor of settlement approval.

> **ii.    the effectiveness of any proposed method of distributing relief to the class;**

Rule 23(e)(2)(C)(ii) requires a court to consider "the effectiveness" of the "proposed method of distributing relief to the class, including the method of processing class-member claims." The claims processing method "should deter or defeat unjustified claims" without being "unduly demanding." Advisory Committee Note to 2018 Amendment to Fed. R. Civ. P. 23. These requirements are met here. The 3,728 individuals in the Settlement Class are readily identifiable from ExecuPharm records (and, in fact, have already been identified), and Notice of the proposed Settlement and its terms will be individually mailed and emailed to each of them. The Parties therefore anticipate a high rate of success in reaching the Settlement Class. Moore Decl. ¶¶ 40-43.

Once the Settlement Class has been notified of the Settlement, the process for submitting a Claim is designed to be consumer friendly. A Claim may be submitted either by mail or via the Settlement Website. Ex. 1, ¶¶ 6.1.4-6.1.5. A Claim for the first seven hours of time spent addressing the Data Breach requires only an attestation that it was incurred in connection with the Data Breach and a brief description of how the time was spent. *Id.* ¶ 5.1.1. And claims for an additional five hours of time and Out-of-Pocket Losses may be supported by a variety of documents. *Id.* ¶¶ 5.1.2; *see also id.* at Ex. 1, Exhibit B (Claim Form).

Further, access to Credit Monitoring Services will be provided in a particularly accessible and convenient format: activation instructions sent via email to all Settlement Class Members who submit a claim for such services. *Id.* ¶ 5.1.4-5.2. Therefore, the Settlement proposes effective

methods of distributing relief to the Settlement Class Members, and with respect to Claims for compensation, deters unsubstantiated claims while without being so burdensome as to preclude those that are compensable. To satisfy the requirements of both Rule 23 and due process, Rule 23(c)(2)(B) provides that, "[f]or any class certified under Rule 23(b)(3) . . . the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See also* Rule 23(e)(1) (requiring that when a class is certified for settlement, "the court must direct notice in a reasonable manner to all class members who would be bound by the court's judgment"). This Rule grants "broad discretion to district courts with respect to the notice's form and content," so long as it "satisfy[ies] the requirements of due process." *In re Dvi, Inc. Sec. Litig*., No. CV 03-5336, 2016 WL 1182062, at *6 (E.D. Pa. Mar. 28, 2016). The proposed Notice meets these requirements.

### iii.    the terms of the proposed award of attorney's fees;

A court must consider "the terms of any proposed award of attorney's fees, including timing of payment" in assessing the fairness and adequacy of a proposed settlement. Fed. R. Civ. P. 23(e)(2)(C)(iii). Pursuant to the Settlement, Class Counsel will move the Court for up to $675,000 in attorneys' fees and expenses. Ex. 1, ¶ 16.1. This fee provision was negotiated after the Parties' counsel agreed upon the substantive material terms of the Settlement and does not diminish the total monetary relief available to the Settlement Class. *Id*. ¶ 16.2; *see also* Moore Decl. ¶ 36. Further, the Settlement is not conditioned upon the Court's approval of the fee request and will become effective regardless of how that issue is decided. Ex. 1, ¶ 16.2. While Class Counsel will provide more information as part of their forthcoming g motion for attorneys' fees, the amount they will seek is significantly less than their lodestar incurred to date. Moore Decl. ¶ 34.

Plaintiff also intends to seek a service award of $5,000 each for Jennifer Clemens in recognition of her time, effort, and risk in prosecuting this case on behalf of Settlement Class Members. *Id*. ¶ 15.1. As with the attorney's fees and expenses, the service award was negotiated after the substantive terms of the Settlement, and the effectiveness of the Settlement is not tied to the Court's approval of this request. *Id*. ¶ 15.2.

### iv.    and any agreement required to be identified under Rule 23(e)(3).

Rule 23(e) mandates that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal," and that the Court must then take into account any such agreements in assessing the relief provided in the settlement. *See* Fed. R. Civ. P. 23(e)(2)(iii), (3). There is no agreement between the Parties, except as set forth in the Settlement Agreement. Moore Decl. ¶ 20.

### 4.    The Settlement Treats Class Members Equitably Relative to Each Other.

The proposed Agreement treats all Settlement Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). All Settlement Class Members will have the same opportunity to file a claim for Out-of-Pocket Losses and Lost Time, which means that monetary compensation will be apportioned in accordance with each Settlement Class Member's Claim.

The Settlement provides that the Alternative Cash Payment available to California Settlement Class Members is $100, which reflects the availability of statutory damages of $100 pursuant to the California Consumer Privacy Act ("CCPA"), a unique state law that provides benefits to Californians who are victims of a data breach. *See* Cal. Civ. Code § 1798.150(a)(1)(A) (permitting recovery of statutory damages between $100-$750). It is well-established that a settlement need not but may account for differences in state law for certain benefits. *See, e.g., Rougvie v. Ascena Retail Grp., Inc.*, 2016 WL 4111320, at *1, 4-5, n.5 (E.D. Pa. July 29, 2016)

(approving settlement agreement that grouped consumers from different states into categories according to the type of recovery generally permitted under relevant state statutes, and noting that class members in "treble recovery states" would receive more than class members in "single recovery states" or "limited recovery states"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272-73 (3d Cir. 2009) (approving settlement that designated greater percentage of settlement value to members who purchased excess insurance policies than those who purchased only non-excess policies). Additionally, because the funds available to pay claims is uncapped, no Settlement Class Member's recovery will be lessened because of another's recovery. This factor therefore weighs in favor of preliminary approval of the proposed Settlement Agreement.

## IV.    THE PROPOSED SETTLEMENT CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION.

To issue notice of a proposed class settlement, the court must find that it will "likely be able to . . . certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Courts have routinely issued notice to proposed settlement classes in data breach cases, which are particularly well-suited to class-wide resolution. *See, e.g., Corra v. ACTS Ret. Servs., Inc*., 2024 WL 22075, at *5 (E.D. Pa. Jan. 2, 2024) (certifying class in data breach cases); *Fulton-Green*, 2019 WL 4677954, at *6-7 (same). This is because in data breach cases, an identifiable group of people suffered the same injury—the theft of their personal information—arising out of the same incident. *See Fulton-Green.* 2019 WL 4677954, at *7 ("Here, all of the claims are almost identical because they stem out of the same underlying activity and the damages should be easily provable and quantifiable. Furthermore, the value of the claims may be small and impractical to litigate on a case by case basis."). So too here. As the proposed Settlement Class readily meets the requirements of Federal Rules of Civil

Procedure 23(a) and (b)(3), this Court should conclude it will likely be able to certify it for purposes of judgment.

    A.    THE RULE 23(A) REQUIREMENTS ARE SATISFIED.

*Numerosity:* The proposed Settlement Class consists of 3,728 geographically dispersed individuals, rendering individual joinder impracticable. As courts in this district and circuit have observed, although there is no "magic number" for numerosity, where the "number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Huffman v. Prudential Ins. Co. of Am.*, 2018 WL 583046, at *8 (E.D. Pa. Jan. 29, 2018) (finding numerosity satisfied with 1,000 class members) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)). In addition to the sheer number of individuals in the Settlement Class, certifying a class is also superior to joinder because the low-dollar amount of the likely claims, along with other barriers to a potential recovery, *see* section III(B)(3)(i), *supra*, would make it difficult and inefficient for individuals to sue separately. *See Fulton-Green*, 2019 WL 4677954, at *4 ("The representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class."). Numerosity is readily satisfied.

*Commonality:* "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" such that their claims "can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (internal citations omitted). Here, the Settlement Class Members' claims share a common factual core, as they each suffered the same alleged injury—theft of their personal data in the Data Breach. The key legal questions are common, too: Did ExecuPharm owe the putative Class Members a duty to safeguard their personal information, and if so, were its cybersecurity measures sufficient to satisfy that duty?

As answering these questions "will resolve [] issue[s] that [are] central to the validity of each one of the claims in one stroke," *id.* at 350, commonality is satisfied. *See also Corra*, 2024

WL 22075, ("Here, every single member of the proposed class was a victim of the Data Security Incident underlying this action, so there are multiple common questions, including how the data breach occurred, whether Defendant had a duty to protect the information, and whether Defendant's employees and customers were harmed by the breach.") (cleaned up); *In re Equifax*, 2020 WL 256132, at *11-12 (noting that courts have found commonality requirement "readily satisfied" in the "context of data breach class actions"). That is certainly the case here.

*Typicality:* To ensure that the Class Representative has the incentive to prove all the elements of the cause of action that would otherwise have been individually brought by class members, Rule 23(a)(3) requires "an inquiry whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Huffman v. Prudential Ins. Co. of Am.*, No. 2:10-CV-05135, 2018 WL 583046, at *9 (E.D. Pa. Jan. 29, 2018).

Here, Ms. Clemens is a former employee of ExecuPharm who spent time and money as a result of the Data Breach and her litigation goals precisely align with those of the Settlement Class Members, as their claims arise from the same Data Breach and involve the same tort and contract theories as all other Settlement Class Members. *See Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) ("cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."). Typicality in this context is easily satisfied. *See Fulton-Green*, 2019 WL 4677954, at *5 (class representatives were typical of class).

*Adequacy of Representation:* "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. No such conflict of interest exists or will arise in this case, as the Class Representative and the

proposed Settlement Class Members allege that they all had their personal information compromised through the same Data Breach and all seek to remedy similar injuries. *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Litig.*, 999 F.3d 1247, 1276 (11th Cir. 2021) (adequacy in data breach case satisfied as plaintiffs' claims "arise out of the same unifying event . . . seek redress for the same injury . . . and seek compensation for injuries associated with the risk of identity theft"); *Anthem*, 327 F.R.D. at 309-10 (adequacy satisfied as "all Settlement Class Members are victims of the same event" and "seek the same relief: compensation for the harms already incurred as a result of the breach and protection against the use of their personal information going forward").

Further, as explained above, *see supra* Section III(B)(1), the Class Representative has retained lawyers who are eminently qualified and experienced in both class action and data breach litigation. *See Corra*, 2024 WL 22075, at *4 (adequacy met where class counsel "have litigated and settled numerous class actions, including data breach class actions."). The adequacy requirement is thus satisfied.

## B.    THE RULE 23(B)(3) REQUIREMENTS ARE SATISFIED.

Parties seeking class certification must also show that the action satisfies at least one subsection of Rule 23(b). Here, the proposed Settlement Class satisfies Rule 23(b)(3)'s requirements that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."[5]

*Predominance:* Common questions predominate if the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This requirement

---

[5] A settlement-only class need not meet one requirement of Rule 23: "[B]ecause the case will never go to trial, the court need not consider the manageability of the proceedings should the case or cases proceed to trial." *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009).

is satisfied when "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Plaintiff alleges that the key questions in this case are whether ExecuPharm had a duty to secure its customers' personal data, and whether it took reasonable steps to do so. And as all Settlement Class Members assert that they face a substantial risk of harm from the same Data Breach, this question can be resolved by consideration of the same evidence as to ExecuPharm's cybersecurity practices and e-mail servers. *See Corra*, 2024 WL 22075, at *5 ("Although there may be slight differences among class members regarding degree of damages or the exact type of injury suffered (e.g., breach of sensitive financial information or breach of health data), none of these differences would preclude resolution on a class-wide basis."). Indeed, the question of whether a defendant took reasonable measures to secure customers' personal data "is the precise type of predominant question that makes class-wide adjudication worthwhile." *In re Anthem*, 327 F.R.D. at 312. And finally, as this Court has previously found that Pennsylvania law supplies the rules of decision in this case, *see* Dkt. 41 at 5-7, there is no concern that any "variations in state law will [] predominate over the common questions." *In re Equifax*, 2020 WL 256132, at *13.

***Superiority:*** "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy . . . ." 7AA Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005). Individually litigating the relatively low-dollar-value claims of 3,728 people dispersed throughout the country, all arising out of the same Data Breach, would be uneconomical and inefficient for both the Settlement Class Members and the courts. *See Corra*, 2024 WL 22075, at *5 ("At this juncture, there is no indication that any members of the proposed class would be interested in

litigating individual claims."); *Fulton-Green*, 2019 WL 4677954, at *7 ("Here, all of the claims are almost identical because they stem out of the same underlying activity and the damages should be easily provable and quantifiable. Furthermore, the value of the claims may be small and impractical to litigate on a case by case basis."). The superiority requirement is thus satisfied.

## V.    THE COURT SHOULD DESIGNATE INTERIM CLASS COUNSEL.

The Parties seek designation of Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP and Mark S. Goldman of Goldman Scarlato & Penny, P.C., as interim Class Counsel in this Action. As noted above, section III(B)(1) *supra*, Class Counsel are highly experienced in data breach litigation and have demonstrated the hard work, legal scholarship, experience, and resources they bring to bear, resulting in the Settlement now before the Court. In addition, they have expended considerable time and resources in investigating and vigorously litigating the claims in this action. The Court should thus appoint them as interim Class Counsel under Rule 23(g)(3) to act on behalf of the Settlement Class in carrying out the Notice and Claims process.

## <u>CONCLUSION</u>

For the reasons set forth set forth above, and as set forth in their Proposed Order, Plaintiff requests that the Court (1) find that it will likely be able to approve the Settlement as fair, reasonable, and adequate and certify the Settlement Class for purposes of entering judgment on the Settlement under Federal Rule of Civil Procedure 23(e), and to therefore direct that Notice be issued to the Settlement Class; (2) appoint interim Class Counsel; (3) approve the proposed Notice plan; (4) appoint the Settlement Administrator; and (5) set a date for the Final Fairness Hearing.

Dated: March 15, 2024                    Respectfully submitted,

                                         /s/ *J. Austin Moore*
                                         Norman E. Siegel (*pro hac vice*)
                                         J. Austin Moore (*pro hac vice*)
                                         Caleb J. Wagner (*pro hac vice*)
                                         **STUEVE SIEGEL HANSON LLP**
                                         460 Nichols Road, Suite 200
                                         Kansas City, Missouri 64112
                                         Telephone: (816) 714-7100
                                         siegel@stuevesiegel.com
                                         moore@stuevesiegel.com
                                         wagner@stuevesiegel.com

                                         Mark S. Goldman (PA Bar No. 48049)
                                         **GOLDMAN SCARLATO & PENNY, P.C.**
                                         161 Washington Street, Suite 1025
                                         Conshohocken, Pennsylvania 19428
                                         Telephone: (484) 342-0700
                                         goldman@lawgsp.com

                                         *Attorneys for Plaintiff*
                                         *and the Proposed Class*

### CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2024, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and therefore, will be transmitted to all counsel of record by operation of the Court's CM/ECF system.

                                         By:    /s/ *J. Austin Moore*
                                                **ATTORNEY FOR PLAINTIFF**

## APPENDIX A – TIMELINE OF SETTLEMENT EVENTS

For convenience, proposed dates and deadlines leading to a Final Fairness Hearing are provided below and in the proposed order separately submitted to the Court.

and this Order include but are not limited to the following:

| ACTION | DEADLINE |
|---|---|
| ExecuPharm provides CAFA notice required by 28 U.S.C. § 1715(b) | Within 10 days after the filing of Plaintiff's Motion for Preliminary Approval |
| Notice Date | 45 days after entry of this Preliminary Approval Order |
| Motion for Attorneys' Fees and Expenses and Service Awards | 21 days prior to Objection Deadline |
| Opt-Out/ Exclusion Deadline | 40 days after Notice Date (i.e., 85 days after entry of this Preliminary Approval Order) |
| Objection Deadline | 40 days after Notice Date (i.e., 85 days after entry of this Preliminary Approval Order) |
| Claims Deadline | 90 days after Notice Date (i.e., 135 days after entry of this Preliminary Approval Order) |
| Final Approval Brief and Response to Objections Due | At least 14 days prior to Final Approval Hearing |
| Final Approval Hearing | No earlier than 90 days after Notice Date (i.e., 150 days after entry of this Preliminary Approval Order) |