**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JENNIFER CLEMENS, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

EXECUPHARM, INC.,

        Defendant.

Case No. 2:20-cv-03383

**DECLARATION IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT PURSUANT TO RULE 23(e)**

I, J. Austin Moore, state and declare as follows:

1.      I serve as counsel to Plaintiff Jennifer Clemens and have led the efforts to prosecute her claims and those of the putative class in the above-captioned action. I submit this Declaration in support of Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement. I have personal knowledge of all the matters addressed in this Declaration.[1]

2.      I am a partner at Stueve Siegel Hanson and have significant experience representing consumers in data breach and privacy litigation. Over the last decade, I have played key roles representing consumers in many of the largest data breach cases in history, including multi-district litigation in *Target Corp.* (consumer settlement valued at $23 million), *The Home Depot* (consumer settlement valued at $29 million), *Anthem Insurance* (settlement valued at $115 million), *Equifax* (settlement valued at over $1.5 billion), *T-Mobile* ($500 million settlement), and

---

[1] All capitalized terms are defined as in the parties March 15, 2024 Settlement Agreement.

*Marriott* (currently pending). My experience in this field includes leading plaintiff vetting efforts, chairing law and briefing committees, and negotiating class-wide settlements.

3.     Among my recent cases, I was appointed as class counsel on behalf of a class of optometrists who were subject to a data breach by the national optometry board. Following a successful appeal to the Fourth Circuit, the court approved an "outstanding" $3.25 million settlement on behalf of more than 61,000 eye doctors. *See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 2019 WL 3183651, at *4-5 (D. Md. July 15, 2019) (finding that myself and co-counsel Norman Siegel "have substantial experience in consumer class action litigation, and in particular data breach and privacy litigation, and were able to negotiate a well-informed Settlement that provides meaningful relief to Plaintiffs and the Class."). I was also recently appointed as co-lead counsel in the Citrix data breach litigation, where I helped negotiate a $2.3 million settlement that received final Court approval in June 2021. *In re Citrix Data Breach Litig.*, 2021 WL 2410651, at *4 (S.D. Fla. June 11, 2021).

4.     In recognition of these efforts, I was recognized by the *National Law Journal* as one of the 2023 "Rising Stars of the Plaintiff Bar" in its Elite Trial Lawyers Award. I was also one of five attorneys named among Law360's 2019 "Rising Stars" in the field of Cybersecurity and Privacy Law, which recognizes attorneys under 40 "whose legal accomplishments transcend their age." My firm, Stueve Siegel Hanson, has twice been selected by Law360 as its Cybersecurity & Privacy Group of the Year, recognizing practice groups that "worked on the biggest deals or achieved the biggest wins in the most important cases."

5.     This experience on the forefront of litigating and resolving data breach cases, including some of the largest in history, was brought to bear on the approach to prosecuting and settling the claims presented in this case. And based on this experience, it is my view that the

Settlement presented here is an excellent result for the Settlement Class, as it both offers to make Settlement Class Members whole for costs already incurred in remedying the breach, as well as comprehensive prospective relief to prevent future harm that could result from the misuse of their stolen personal information. Thus, I am confident that this Settlement is fair, reasonable, and adequate and in the best interests of the 3,728 individuals who were impacted by the March 2020 ExecuPharm Data Breach.

### Overview of the Litigation and Settlement Discussions

6.      Plaintiff Jennifer Clemens began working for ExecuPharm in February 2016 as a clinical technical editor. As a condition of employment, she was required to give the company substantial information about herself, her finances, and her family. ExecuPharm promised that it would keep this information secure, stating in its employment contract that it "will take appropriate measures to protect the confidentiality and security of all personal data." Plaintiff left the company later that year, but ExecuPharm continued to retain her data even after she was no longer employed.

7.      More than three years later, a ransomware hacking group known as "CL0P" launched a successful attack on ExecuPharm's computer system. After exfiltrating the personal information of Plaintiff and other ExecuPharm employees, the hackers disseminated the information onto the "dark web"—non-indexed websites that can only be accessed by use of an anonymizing browser, which can be used to sell stolen information to identity thieves and other criminals. As a result of the breach of her personal information, Plaintiff was required to take numerous steps to protect herself from identity theft and other further harm, including purchasing a monthly credit monitoring service to mitigate the risk of criminal activity to her and her family at a cost of $39.99 per month. Further, the stress and anxiety induced by the incident were such that she had to seek counseling services.

8.     Prior to filing any litigation arising out of the Data Breach, Proposed Interim Class Counsel ("Class Counsel")[2] conducted a thorough investigation of the potential claims, including by extensively researching Defendant's business practices, consulting with experts regarding the nature and scope of the Data Breach, and interviewing victims.

9.     Following our investigation of the case, ExecuPharm and Plaintiff (collectively, the "Parties") actively and vigorously litigated their claims and defenses arising out of the Data Breach for close to four years.

10.     On July 10, 2020, Plaintiff filed suit against ExecuPharm and Parexel in the United States District Court for the Eastern District of Pennsylvania. Dkt. 1. She sought to represent a class of similarly situated victims of the data breach, and asserted seven counts against ExecuPharm for negligence, negligence *per se*, breach of implied contract, breach of express contract, breach of fiduciary duty, breach of confidence, and a request for declaratory judgment, and four counts against Parexel for negligence, negligence *per se*, breach of implied contract, and declaratory judgment. *Id.* at ¶¶ 116-161.

11.     Initially, ExecuPharm and Parexel sought dismissal under Federal Rule of Civil Procedure 12(b)(6), raising numerous claim-specific arguments. Dkt. 14. While the motion was pending, the Court ordered the Parties to file supplemental briefing addressing the question of Article III standing under the Third Circuit Court of Appeals' decision in *Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011).

12.     The Parties briefed the standing issue, and shortly thereafter, the district court rendered its judgment, holding that the Plaintiff lacked standing to sue. Dkt. 27. It held that "the

---

[2] In conjunction with Settlement, Plaintiff seeks the appointment of Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP and Mark S. Goldman of Goldman Scarlato & Penny, P.C., as Interim Class Counsel pursuant to Rule 23(g).

Third Circuit drew a bright line—allegations of an increased risk of identity theft resulting from a security breach are insufficient to secure standing." *Id.* at 9. Applying this bright line rule, it held that because Ms. Clemens had not been a victim of identity theft or other fraud, she did not have standing to sue, regardless of the manifest risk she and other employees faced. *Id.* at 10-12.

13.     Plaintiff then appealed. Dkt. 29. After full briefing and argument, a unanimous Third Circuit panel vacated the district court's judgment, holding that "in the data breach context, where the asserted theory of injury is a substantial risk of identity theft or fraud", a plaintiff has standing "as long as he alleges that the exposure to that substantial risk caused additional, currently felt concrete harms", such as "emotional distress or spen[ding] money on mitigation measures like credit monitoring services." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155–56 (3d Cir. 2022).

14.     In assessing whether the risk is substantial, the Third Circuit set out a list of "non-exhaustive factors" meant to "serve as useful guideposts", including "whether the data breach was intentional", "whether the data was misused", and "whether the nature of the information accessed through the data breach could subject a plaintiff to a risk of identity theft." *Id.* at 153-54. Applying these factors to the facts in this case, the court held that "Clemens has standing to assert her contract, tort, and secondary contract claims" because "she has alleged a future injury—the risk of identity theft or fraud—that is sufficiently imminent." *Id.* at 159.

15.     Following remand to this Court, Defendants again pressed the arguments raised in their original motion to dismiss. Dkt. 33. Plaintiff opposed these arguments, *see* Dkt. 34, and the Court largely sustained her claims. Dkt. 41. It found that she had stated a claim under Pennsylvania law against ExecuPharm for negligence, breach of express and implied contract, and for declaratory judgment. *Id.* at 7-14.

16.     It did, however, dismiss Plaintiff's claims against Parexel, as well as her claims for negligence *per se*, breach of fiduciary duty, and breach of confidence asserted against ExecuPharm, though it granted her leave to amend as to the latter two. *Id.* at 7; 11-13. Plaintiff did so amend, filing her First Amended Complaint, which omitted Parexel as a defendant and included additional allegations bearing on her claims for breach of confidence and fiduciary duty. Dkt. 49. The Court thereafter dismissed those two claims. Dkt. 55.

17.     ExecuPharm answered, *see* Dkt. 57, and the Court subsequently set the case for a status conference. Dkt. 58. Before that conference occurred, though, the Parties agreed to terms for a settlement of the case and filed a notice regarding the same. Dkt. 59.

18.     On January 23, 2023, counsel for the Parties participated in a full-day mediation with mediator Robert A. Meyer of JAMS. Though that mediation did not result in settlement, the Parties continued negotiations through Mr. Meyer and directly through counsel but were initially unsuccessful at reaching resolution.

19.     The Parties thereafter returned to litigation in this Court. As motion practice was progressing in litigation, the Parties maintained an ongoing dialogue concerning possible settlement of the case. And though formal discovery in this action was stayed pending the motions to dismiss, the Parties engaged in settlement-related discovery that provided Class Counsel with adequate and sufficient information to engage in informed negotiations on behalf of the Settlement Class. After the scope of the case was set by the Court's orders, the Parties agreed to the material terms of a settlement on February 12, 2024. After reaching this agreement in principle, the Parties finalized the terms of this Settlement Agreement and the exhibits attached hereto ("Settlement" or "Agreement").

20.     At all points, the Parties' settlement negotiations were conducted at arms-length and were non-collusive. There is no agreement between the Parties except as set forth in the Settlement Agreement.

## The Settlement Benefits Conferred on the Class

21.     The Settlement offers multiple types of relief to the Settlement Class: funds to reimburse those who spent money as a result of the Data Breach up to $10,000 per claimant, funds to reimburse those who spent time as a result of the Data Breach up to $300 per claimant, and three years of 3-Buruea credit monitoring services that retail for $720 per class member. Class Counsel feel confident that the Settlement provides Class Members with an excellent result, and that it is fair, reasonable, and adequate.

22.      Following the mailing of the notices, Settlement Class Members will have 90 days to file claims for three years of 3-bureau credit monitoring services and two types of losses arising from the Data Breach: Out-of-Pocket Expenses and Lost Time. Settlement Agreement, ¶ 2.8; 5.1.1-5.1.4.

23.     The aggregate cash funds available to settle these claims is uncapped, meaning that Settlement Class Members will be paid 100% of their losses subject to the individual caps set forth in the Settlement Agreement, without any risk of a reduction based on the number of claimants. This is a material benefit as Settlement Class Members will know exactly what they are eligible to receive at the time they submit a claim.

24.     The first component of the Settlement is reimbursement of Out-of-Pocket Losses resulting from the Data Breach, up to $10,000 per individual. The Settlement reimburses Settlement Class Members for the following broad range of harms that are likely to flow from the Data Breach: (1) costs, expenses, losses, or other charges incurred as a result of identity theft or

identity fraud, falsified tax returns, or other possible misuse of a Settlement Class Member's Personal Information; (2) costs incurred after the Data Breach was disclosed associated with changing accounts or engaging in other mitigative conduct, such costs may include notary, fax, postage, copying, mileage, and long-distance telephone charges; (3) professional fees incurred to address the Data Breach; and (4) purchasing credit monitoring or other mitigative services after the Data Breach was disclosed, through the date of the Settlement Class Member's Claim submission.

25.     I have worked on multiple data breach actions whose resolution included reimbursement for out-of-pocket expenses. In my experience, a data breach victim's expenses relating to the breach are typically associated with seeking advice about how to address the breach (*e.g.*, paying for professional services), paying incidental costs associated with identity theft or fraud (*e.g.*, overdraft fees or costs for sending documents by certified mail), or taking mitigative measures like paying for credit monitoring or credit freezes. As such, the out-of-pocket expenses associated with a data breach are generally relatively modest, and rarely exceed several hundred dollars. When victims spend more than this amount, it is typically due to professional services such as accountant or attorneys' fees.

26.     Available research confirms our experience. A study conducted by the Ponemon Institute, a company that conducts independent research on privacy, data protection, and information security policy, found that in the aftermath of a data breach, 81% of victims do not have any out-of-pocket losses, and for the 19% that do, those losses average to $38 per individual.[3]

---

[3] Ponemon Institute Research Report, *The Aftermath of a Data Breach: Consumer Sentiment*, available at: https://www.ponemon.org/local/upload/file/Consumer%20Study%20on%20Aftermath%20of%20a%20Breach%20FINAL%202.pdf.

27.     In addition to Out-of-Pocket Losses, the Settlement reimburses Settlement Class Members for time they spent related to the Data Breach ("Lost Time"). Settlement Class Members can make a claim for reimbursement for up to seven (7) hours of time spent at $25 per hour ($175) without documentation, and an additional five (5) hours at $25 per hour ($125) with reasonable documentation of how the time was spent. Settlement Agreement, ¶ 5.1.1-5.1.2. This is an important benefit as it permits Settlement Class Members to receive compensation for their valuable time and effort spent dealing with the Data Breach.

28.     Additionally, in lieu of submitting a claim for Out-of-Pocket Losses, Undocumented Lost Time, and Documented Lost Time, the Settlement also provides California residents the option to recover a one-time payment of $100 without the need to provide any documentation. This Alternative Cash Payment reflects the availability of statutory damages of $100 pursuant to the California Consumer Privacy Act ("CCPA"), a unique state law that provides benefits to Californians who are victims of a data breach. *See* Cal. Civ. Code § 1798.150(a)(1)(A) (permitting recovery of statutory damages between $100-$750).

29.     The process for submitting a Claim is designed to be consumer friendly. A Claim may be submitted either by mail or via the Settlement Website. Ex. 1, ¶¶ 6.1.4-6.1.5. A Claim for the first seven hours of time spent addressing the Data Breach requires only an attestation that it was incurred in connection with the Data Breach and a brief description of how the time was spent. *Id.* ¶ 5.1.1. And claims for an additional five hours of time and Out-of-Pocket Losses may be supported by a variety of documents. *Id.* ¶¶ 5.1.2.

30.     The Settlement also provides concrete benefits to Settlement Class Members concerned about future misuse of their compromised information. It makes available to all Settlement Class Members three years of free three-bureau credit monitoring services. *Id.* ¶ 5.1.4.

Credit monitoring is a service that monitors an individual's credit reports and alerts the individual when any change is made that could signal fraudulent activity, such as new credit card or loan applications, new credit inquiries, existing account changes, and new public records or address changes, among others. This service gives the individual the opportunity to confirm the accuracy of a credit change in real time and, if necessary, address the issue before fraud occurs or expands.

31.    The Parties have selected CyEx's Identity Defense Total as the Credit Monitoring Service to offer Settlement Class Members. This product includes three-bureau credit monitoring, which means that it monitors activity of all three major credit reporting agencies in the United States: Experian, Equifax and TransUnion. Because each agency operates independently from one another, and the information they receive from creditors can be different, utilizing a service that monitors an individual's reports with all three agencies ensures that there are no gaps in coverage.

The following features are included with the Identity Defense Total product:

- *3 Bureau Credit Monitoring* - Monitors credit files at Experian, Equifax, and TransUnion and sends alert when potential fraudulent activity occurs

- *Monthly Credit Score* - Tracks credit status with a monthly VantageScore 3.0

- *Change of Address Monitoring* – Sends alert when mail is rerouted to new address

- *Real-Time Inquiry Alerts* - Notifies in real time when a credit inquiry within a credit file is detected

- *Real-Time Authentication Alerts* - Provides notification when a creditor receives a request for certain types of account transaction using individual's Social Security Number

- *Dark Web Monitoring* - Tracks and alerts when personal information is found on dark web

- *$1,000,000 Identity Theft Insurance* – No deductible to file a claim

- *Real-Time Customer Support* - Agents trained in fraud resolution assistance

32. The Credit Monitoring Services provide significant value to the Settlement Class. While the Parties were able to secure discounted pricing based on the size of the Settlement Class, the retail value of this product is $19.99 per month, equating to a benefit of nearly $720 per class member and $2.7 million for the class as a whole.

**Attorneys' Fees and Expenses and Service Awards**

33. The Parties only discussed attorneys' fees, expenses and Plaintiffs' service awards after the substantive terms of the Settlement had been agreed upon. Prior to that point, the Parties had only discussed that ExecuPharm would separately pay for reasonable costs and fees, as ordered by the Court.

34. Ultimately, the Parties agreed that ExecuPharm would not object to Class Counsel's motion for up to $675,000 in attorneys' fees and expenses. Settlement Agreement, ¶ 16.1. This amount is significantly less than the lodestar for Class Counsel's work on this case.

35. ExecuPharm has also agreed not to object to a request for a service award for Plaintiff in the amount of $5,000, in recognition of the time, effort, and expense she incurred in pursing claims that ultimately benefited the entire Settlement Class. *Id*. ¶ 15.1.

36. ExecuPharm will pay for these attorneys' fees, expenses, and service awards, as approved by the Court, separate and apart from all other relief made available under the Settlement. *Id*. ¶¶ 16.1-16.2. As a result, the payment of attorneys' fees and service awards will not reduce any of the relief made available to Settlement Class Members, and they are intended to be considered separately from the fairness, reasonableness, and adequacy of the Settlement. *Id*. ¶ 16.2.

**Proposed Notice and Claims Process**

37. Based on my experience in class action and data breach litigation, I believe that the Parties have devised a Notice and Claims process that will have a high rate of success in reaching

Class Members, provide them with the relevant information regarding their rights and options in a clear and concise manner, and efficiently guide them through the process of making a Claim and accessing Credit Monitoring.

38.     First, after a competitive bidding process, the Parties have retained, and request that the Court appoint Simpluris, Inc. ("Simpluris"), as the Settlement Administrator. Simpluris is well-versed in administering class-action settlements, specifically including in the data breach context.

39.     Within 45 days after Preliminary Approval, Simpluris will mail notice of the Settlement to all Class Members via U.S. mail (the "Notice Date"). Settlement Agreement, ¶ 2.24. Prior to dissemination of Notice, Simpluris will have set up both a website ("Settlement Website") where the Settlement Class may access information about the Settlement and submit Claims, and a toll-free number ("Settlement Toll-Free Number") where they may seek information relevant to the Settlement. *Id.* ¶¶ 6.1.4; 6.1.6.

40.     Simpluris will send Class Members notice by direct U.S. Mail and e-mail where such information is known, with an additional e-mail reminder to be sent to those Class Members who do not initially submit claims. The mailed notice will include the entire Long Notice and the e-mailed notice will include the Short Notice, each of which will inform Settlement Class Members of the Settlement, summarize the benefits available to them, and refer them to the Settlement Website for more information regarding the Settlement, including instructions on filing a Claim.

41.     The Settlement Website will include the Long Notice and provide more details regarding the underlying Action and Settlement, including how to opt out of or object to the Settlement; how to submit a Claim (including an option for doing so electronically); the deadline to submit a Claim, opt out, or object; and information regarding the date, time, and location of the Final Fairness Hearing.

42.     Settlement Class Members have 90 days after the Notice Date to make a Claim for benefits, or 40 days to opt out of the Settlement. *Id*. ¶¶ 2.8, 2.26. The Settlement Administrator will mail checks (or other electronic means of payment such as PayPal and Venmo) for approved claims within thirty (30) days of final approval of the Settlement (the "Effective Date"), or after the date the Claim is approved, whichever is latest. *Id*. ¶ 19.2.

43.     As this proposed Notice plan provides direct notice to an already-identified set of individuals in the Settlement Class, and concisely and plainly informs them of their rights and options with respect to the Settlement, the Parties believe that it provides the "best notice practicable" under the circumstances as required by Federal Rule of Civil Procedure 23(c)(2), and believe it will likely result in a high rate of participation.

**Release**

44.     In exchange for the benefits provided under the Settlement, Settlement Class Members will release "on behalf of themselves, their heirs, assigns, beneficiaries, executors, administrators, predecessors, and successors, and any other person purporting to claim on their behalf, hereby expressly, generally, absolutely, unconditionally, and forever release and discharge any and all Released Claims against the Released Parties, except for claims relating to the enforcement of the Settlement or this Agreement. *Id.* ¶ 11.1.

**<u>The Proposed Settlement is Fair, Adequate, and Reasonable</u>**

45.     I believe the proposed Settlement provides an excellent result to the Class, and is fair, reasonable, and adequate. It was reached after vigorous adversarial litigation that spanned four years and included a hard-fought and consequential appeal to the Third Circuit necessary for Plaintiff to secure Article III standing to assert her claims. The Settlement was negotiated at arms-length with the assistance of a mediator.

46.     At this juncture in the case, Class Counsel and the Parties have an understanding of the case that is sufficient to permit an informed settlement of the Plaintiff's and Class Members' claims.  Class Counsel have significant experience in data breach and privacy litigation, including in class actions and their settlements, which allows us to assess the strengths and weaknesses of the claims and remedies that are available to Plaintiff and the Class. Further, this Court's detailed decisions on the Defendant's motions to dismiss addressed the Parties' arguments with respect to each of Plaintiff's claims and provided significant guidance on Plaintiff's remaining claims for negligence, breach of express and implied contract, and a declaratory judgment.

47.     Based on my experience and the developments in this litigation, I feel confident about the strength of Plaintiff's case. Nonetheless, we face significant risks to the case going forward. Data breach litigation is still a developing field, and the jurisprudence in this area is constantly evolving. It is therefore difficult to accurately predict the course of this case, and especially given the lack of Third Circuit jurisprudence on many important issues yet to be decided, including particularly that of class certification, additional appeals are certain to follow.

48.     Thus, taking into account the risks and costs to continuing this case, I believe that the Settlement provides Settlement Class Members with an excellent result. It both makes Settlement Class Members whole for expenses already incurred in connection with the Data Breach, such as Out-of-Pocket Losses and Lost Time, and establishes meaningful prospective relief in the form of Credit Monitoring Services for a three-year period. It thus makes Class Members whole for losses already incurred and provides future protection from the substantial risk of harm that they face for the next several years. And the protective value of the prospective relief is enhanced by its immediate availability, closer in time to the alleged theft of Settlement Class Members' personal information, rather than after years of protracted litigation.

49.     Thus, I respectfully request that this Court grant preliminary approval of the Parties' Settlement, and direct notice of it to the Settlement Class.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of March, 2024.


/s/ *J. Austin Moore*
J. Austin Moore

*Counsel for Plaintiff and the Class*

15